IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | NO. 11-480-01 |
| DERRICK GARVIN | : | |
| | : | |

FILED
MAY 31 2012

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

**MOTION TO SUPPRESS EVIDENCE**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Rufe, J.                                                                                   May 31st, 2012

The indictment in this case charges Derrick Garvin with possession of a firearm by a convicted felon. Garvin filed a motion to suppress the weapon found in a frisk, and also to suppress admissions he made after his arrest as fruit of the poisonous tree.[1] Upon consideration of the motion and opposition thereto, and after an evidentiary hearing on January 4, 2012, the Court enters the following findings of fact and conclusions of law.

**I.    FINDINGS OF FACT**

1.    On April 6, 2011, Philadelphia Police Officers Michael Minor and Frank Dowd were patrolling together, in uniform and in a marked police vehicle.[2]

2.    At approximately 10:25 p.m., Officers Minor and Dowd received a radio call ("flash") reporting that a black man with a gun, wearing a black hooded sweatshirt ("hoody") and walking a dog, was at the intersection of 56th Street and Greenway in front of a Chinese store.[3]

---

[1] Garvin does not allege any <u>Miranda</u> violation. Transcript of Jan. 4, 2012 Suppression Hearing ("Tr.") 4.

[2] Tr. 25.

[3] Tr. 26, 49, 83.

That flash provided no information about the source of the tip, nor did it indicate that the subject of the flash had committed any crime.[4]

3.      Officers Minor and Dowd drove to that intersection, arriving there less than a minute later. Seeing no one, they turned onto 56th Street, and saw only one man who met the flash description walking south on 56th Street (Defendant), about half a block from the Greenway intersection.[5] Defendant was the only person walking on that block at the time.[6] He was wearing a dark gray hoody, black jeans, a red shirt, and black and white sneakers,[7] and was walking a dog.[8]

4.      As the officers watched Defendant, a marked police emergency patrol wagon drove southbound past Defendant and parked at the corner of 56th and Woodland Avenue. Defendant, who had been walking south, abruptly turned around and began walking north.[9]

5.      Officers Minor and Dowd then stopped their vehicle alongside Defendant. Defendant looked at them and then walked up the steps of a residence at 1926 South 56th Street and knocked on the door.[10]

6.      1926 South 56th Street is the home of Essie Jackson, who lives alone. Ms.

---

[4] Tr. 27.

[5] Tr. 26-27, 32-33.

[6] Tr. 33.

[7] Tr. 72, 83.

[8] Tr. 12, 28, 55, 73.

[9] Tr. 28.

[10] Tr. 28. Officer Minor recalls Defendant knocking or banging on the door. However the resident testified that Defendant rang her doorbell. Tr. 10. The Court does not find this discrepancy to be material.

Jackson knows Defendant, as he lives a block from her home and he had been in her home in the past to visit with her son while her son was still living with her.[11]  She could see Defendant at her door, and, through the window in the door, heard him say "Open the door."[12]  Through the window, Officer Minor observed her shake her head "no."[13]  She did not open the door to let Defendant enter.[14]

7.     Ms. Jackson testified that she could see the police patrol car on the street outside her house when she arrived at the door,[15] and saw police officers emerge from the car onto the sidewalk.[16]

8.     Ms. Jackson heard the officers instruct Defendant to come down the stairs.[17] While Defendant was still standing on her steps, she opened her door.[18]  An officer asked her if she knew Defendant and whether he lived in the house.  She responded that she knew him but that he did not live there.[19]

9.     Defendant then walked down the steps to the sidewalk.[20]  By this time, additional

---

[11] Tr. 9, 12, 13.

[12] Tr. 12, 13.

[13] Tr. 29.

[14] Tr. 12-13.

[15] Tr. 10.

[16] Tr. 14.

[17] Tr. 14, 19.

[18] Tr. 14, 15.

[19] Tr. 14.

[20] Tr. 29.

3

officers had arrived.[21]  Concerned that the dog might be vicious, the officers asked Defendant to tie his dog to a fence, and Defendant complied.[22]

10.     The officers asked Defendant if he had any weapons and he said no.  He was then informed that Officer Dowd would conduct a frisk search for weapons.  Defendant was compliant.[23]

11.     Officer Dowd conducted a frisk search around the waistband of Defendant's pants and found a handgun, which Dowd removed.[24]  The gun was later identified as a black semiautomatic .40 caliber Glock 22, loaded with nine rounds of ammunition.[25]

12.     Defendant told officers that he had a permit to carry a concealed weapon.  This statement was checked by the police dispatcher and found to be false.[26]  At that point, Defendant was arrested, handcuffed, and placed in the back of the patrol car. [27]

13.     Before leaving for the police station, Ms. Jackson called Defendant's family to pick up his dog.[28]  When she failed to reach anyone, the officers called Defendant's nephew to pick up the dog.[29]

_____

[21] Tr. 29.

[22] Tr. 29.

[23] Tr. 31.

[24] Tr. 31-32.

[25] Tr. 32.

[26] Tr. 32, 35.

[27] Tr. 35.

[28] Tr. 16.

[29] Tr. 16.

4

14.     At the police station, Officer Dowd and Defendant were interviewed by Detective Robert Conway.[30]  Defendant was read his Miranda rights, and signed a form waiving certain rights.[31]

15.     After receiving his Miranda warnings, Defendant admitted to Detective Conway that he had been in possession of a firearm.  He described the type of firearm, and indicated that it had been tucked into his waistband.[32]

## II.   DISCUSSION

The Fourth Amendment to the United States Constitution reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by an oath or affirmation, and particularly describing the place to be searched and the person or things to be seized."

Defendant argues that his Fourth Amendment rights were violated when Officers Minor and Dowd asked him to tie up his dog and subjected him to a frisk search.  He seeks to suppress the weapon found during the frisk, and also his later admission to owning and carrying the gun. He argues the police did not have reasonable suspicion to stop him based on the radio flash, and that the police lacked probable cause to conduct the search and seizure during which the officers found the gun.  Additionally, Defendant argues that his statement, taken after his arrest and after administration of Miranda warnings, should be suppressed because they followed an unlawful

---

[30] Tr. 36-37, 68.

[31] Tr. 69, Gov't Ex. A.

[32] Tr. 72.

search and seizure.

Reasonable Suspicion to Conduct a *Terry* Stop

First, Defendant argues that Officers Minor and Dowd had no basis for stopping and frisking him, as the flash report was not highly specific, there was no evidence that he had engaged in any illegal activity prior to the stop, and his actions that night on 56th Street would not have given rise to a reasonable suspicion of illegal activity. Upon consideration of the facts adduced at the suppression hearing, the Court disagrees.

In the absence of a warrant, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."[33] Such as stop is referred to as a Terry stop, after the case Terry v. Ohio.[34] In Terry v. Ohio, the Supreme Court held that:

> . . . where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.[35]

An officer can conduct a Terry stop and frisk without the level of information necessary to

---

[33] Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (discussing Terry v. Ohio, 392 U.S. 1 (1968)).

[34] 392 U.S. 1 (1968).

[35] Terry, 392 U.S. at 30-31.

establish probable cause to arrest.[36]

When assessing whether the reasonable suspicion standard is met, the Court must consider the totality of the circumstances, including factors such as the reliability of an informant's tip,[37] defendant's location vis-à-vis the location provided by an informant's tip, the presence of the defendant in a high crime area, a defendant's presence on the street at a late hour, the defendant's behavior (including nervous, evasive behavior), the police officers' knowledge, training, and experience, and officers' judgments and inferences about human behavior,[38] which inferences may be a matter of common sense or may draw upon specialized training and experience.[39] Even when conduct is ambiguous, lawful, or susceptible of an innocent explanation, officers may detain individuals briefly to investigate and resolve ambiguities in their conduct.[40]

Once officers have determined that an investigatory stop is warranted by the totality of the circumstances, "they may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'"[41] They may, for example, conduct a pat down ("frisk") of the outer clothing of the person detained in order to discover

---

[36] Adams v. Williams, 407 U.S. 143, 145 (1972).

[37] When a reasonable suspicion is based on a tip from an informant, the Third Circuit instructs the Court that the tip must contain sufficiently particularized information and reflect personal knowledge about the subject of the tip. United States v. Nelson, 284 F.3d 472, 480 (3d Cir. 2002).

[38] Wardlow, 528 U.S. at 124; United States v. Brown, 448 F.3d 239, 251 (3d Cir. 2006); Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003); United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002).

[39] United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Ornelas, 517 U.S. 690, 700 (1996).

[40] Wardlow, 528 U.S. at 125; Johnson, 332 F.3d at 207.

[41] United States v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)).

weapons which might be used to assault the officers.[42]

Here, at approximately 10:35 p.m., the officers received a radio flash reporting an armed man walking his dog at the corner of 56th and Woodland Avenue.[43] The flash described a person by sex, race, and clothing, and noted that he was walking a dog at a particular intersection. The officers found Defendant, who met the physical description, walking his dog within half a block of the identified intersection. It was late at night and the streets were otherwise empty of pedestrians. As Defendant's gun was concealed in his waistband, this information was not available to any observer but indicated that the informant had personal knowledge that Defendant was armed. Therefore, the stop of Defendant was based on a tip containing particularized information and reflecting personalized knowledge. However, as some individuals are legally permitted to carry guns pursuant to the Second Amendment of the Constitution, a reasonable suspicion that an individual is carrying a gun, without more, is not evidence of criminal activity afoot. Therefore, the tip alone was not sufficient to support an investigatory stop and the Court must examine whether the stop was supported by other factors.

While the officers were watching him, Defendant took two actions which Officers Minor and Dowd reasonably interpreted as evasive. First, he abruptly turned from walking southbound to walk northbound when a marked police vehicle passed him driving southbound and stopped at the corner. Second, when Officers Minor and Dowd pulled up and stopped beside him in a second marked police vehicle, Defendant went up the stairs to a residence and sought entry. Defendant makes much of the fact that he did not "flee" when he saw the officers. However, he

---

[42] Terry 392 U.S. at 30-31.

[43] The Court heard no testimony regarding the crime rate in this neighborhood.

did take two separate actions indicative of evasion, and the officers on the scene observing his behavior could reasonably have interpreted these ambiguous actions as suspicious.[44]

Although neither the two acts of evasion nor the tip would alone give rise to reasonable suspicion, taken together, along with other factors such as the lateness of the hour, his oral demand that Essie Jackson open the door, Ms. Jackson's refusal to open the door to admit him to her home, and justifiable inferences the officers made based on their experience and training, the Court finds that Officers Minor and Dowd had reasonable suspicion supporting a Terry stop of Defendant to investigate his behavior further.

### The Investigation Was Within the Bounds of a *Terry* Stop

Defendant argues that even if the Court finds reasonable suspicion for the stop, the officers went outside the bounds of a Terry stop. He argues that the officers did not have probable cause to seize him, and yet, in requiring him to restrain his dog and submit to a search of his person, the officers transformed the encounter into a *de facto* arrest and search incident to arrest. Specifically, Defendant asserts that the officers' orders to come down off the steps, tie up his dog, raise his hands, and submit to being frisked went beyond what is allowed under Terry and amounted to an arrest. The Court disagrees.

As noted above, Officers Minor and Dowd had reasonable suspicion to support a brief investigatory stop. They ordered Defendant down off the steps only after Ms. Jackson denied him admission to her home. Having stopped Defendant for a brief investigation, they were

---

[44] Cf. United States v. Roberson, 90 F.3d 75, 75 (3d Cir. 1996) (an anonymous tip providing readily observable information does not provide reasonable suspicion for a Terry stop in the absence of police observations of suspicious conduct).

authorized to take reasonably necessary steps to protect their personal safety.[45]  The officers asked Defendant to secure his dog to the fence during the stop out of legitimate practical and safety concerns.  Given the content of the flash information they had received, an above-the-clothes pat-down for a gun was warranted.  The weapon was quickly discovered in Defendant's waistband.  The Court heard no testimony suggesting that the search for the weapon was prolonged or unduly intrusive.  After the gun was found, the officers detained Defendant briefly while they investigated whether Defendant was carrying the gun legally or illegally.  They arrested him only after determining that he did not have a permit to carry a concealed weapon.  Consequently, the Court will deny Defendant's motion to suppress the weapon found during the search.

### Fruit of the Poisonous Tree

After Officer Dowd found the weapon in Defendant's waistband during the Terry stop, and after the police dispatcher reported that Defendant did not have a license to carry the gun, the officers placed Defendant under arrest and transported him to the police station.  At the police station, Detective Conway provided Defendant with Miranda warnings and interviewed him. Defendant voluntarily revealed information regarding his possession of the weapon.  As the Terry stop was supported by reasonable suspicion, the gun was found during that Terry stop, and further investigation provided probable cause to make the arrest, Defendant's fruit of the poisonous tree argument is without merit.  Accordingly, Defendant's statements subsequent to his arrest will not be suppressed.

---

[45] United States v. Hensley, 469 U.S. 221, 235 (1985).

10

## III.    CONCLUSIONS OF LAW

1.    Based upon all of the information available to Officers Minor and Dowd, the decision to stop Defendant was supported by reasonable suspicion and did not violate the Fourth Amendment.

2.    Officer Dowd found the gun in Defendant's waistband during a reasonable Terry stop and pat-down.  The officers did not require probable cause to conduct that search, as it was not made pursuant to a full seizure.

3.    Defendant was detained only briefly to allow the officers to investigate whether Defendant had a permit to carry the gun.  This investigation provided probable cause to arrest Defendant for carrying the gun without a permit.

4.    Statements Defendant made following his arrest (and after Miranda warnings) were given voluntarily and will not be suppressed as fruits of the poisonous tree.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that there is no basis to exclude either the gun or Defendant's statements about the gun.  Defendant's Motion to Suppress is denied.

An appropriate Order follows.